IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

AQUATIC AV, INC., a California corporation,

Plaintiff,

v.

MAGNADYNE CORPORATION, a California corporation, and SSV WORKS, INC., a California corporation,

Defendants.

No. C 14-01931 WHA

**ORDER ON CLAIM CONSTRUCTION AND PARTIAL SUMMARY JUDGMENT**

## INTRODUCTION

In this patent-infringement action involving docking stations, the parties seek construction of two phrases and defendants move for summary judgment of non-infringement and/or invalidity of claims in one of the two asserted patents. For the reasons stated herein, defendants' motion is **GRANTED**.

## STATEMENT

Digital media docking stations with remote controls occupy our center stage. Our patentee, Aquatic AV, Inc., and our accused infringer, Magnadyne Corporation, compete in making and selling docking stations to spa manufacturers so that, for example, an electronic device (like an iPod) may be enclosed within a housing for protection from water damage. SSV Works, Inc., the other accused, makes and sells docking stations for all-terrain vehicles.

Our patentee asserts two patents, although only one pertains to the instant motion for summary judgment. U.S. Patent No. 7,831,756 ("the '756 patent"), entitled "Apparatus and

1 Method for Docking and Housing a Removable Electronic Device," was filed on July 25, 2007,
2 and issued on November 9, 2010. The other asserted patent, a continuation-in-part, is
3 U.S. Patent No. 8,578,081 ("the '081 patent").

Turning back to the '756 patent (at issue now), here is its Figure 3, which illustrates the housing 100 containing an electronic device 150 with a control interface 105 and a remote control 160.



**Figure 3 From the Specification**

## ANALYSIS

**1.   SSV WORKS.**

SSV Works' unopposed motion for summary judgment of non-infringement of the '756 patent is **GRANTED**.

2

**2.    MAGNADYNE.**

Asserted independent Claim 16 covers (col. 10:22–32) (emphasis added):

> 16.    An apparatus for housing and controlling a removable electronic device, the apparatus comprising:
>
> a housing unit comprising:
>
> an enclosure for housing the electronic device, wherein *the enclosure hermetically seals the electronic device within the housing unit*; and
>
> a connector for coupling with the electronic device; and
>
> a user interface for controlling the electronic device when the electronic device is housed in the housing unit, wherein *the user interface detachably couples from the housing unit*.

Our parties dispute the construction of the bolded and italicized phrases above, but the real dispute boils down to the meaning of the phrases "hermetically seals" and "detachably couples."

**A.    "the enclosure hermetically seals the electronic device within the housing unit."**

The parties' proposed constructions are:

| PATENTEE'S PROPOSED CONSTRUCTION | ACCUSED'S PROPOSED CONSTRUCTION |
|---|---|
| "the enclosure is sealed in a manner to provide a waterproof enclosure" | "the housing unit is sealed such that air cannot penetrate the enclosure" |

It would serve our patentee right, as the drafter, to hold that "hermetically seals" means what every American ordinarily thinks it means — namely, airtight (Lorelli Exh. 10). Our patentee littered the specification with references to "substantially hermetically seals" but then expressly limited the claim language to "hermetically seals," dropping the "substantially" modifier. If we held our patentee to the words actually used, the accused products would not infringe.

The problem is that our patentee insists that airtight is not and never was the meaning and indeed, contends that *the phrase "hermetically seals" did not have an accepted meaning within the field of art in 2007* (Ganaja Decl. ¶¶ 7, 43). In these proceedings, our patentee has led us

3

through a cascade of ever-changing meanings that, as will be shown, introduces the very imprecision Section 112 prohibits.

In the specification, the applicant repeatedly referred to an invention used in connection with boats, cars, and campers so that the electronic device enclosed within was protected from "wet conditions," a "wet environment," "water damage," and the "elements" (cols. 2:5–7, 20–23, 8:17–22, 56–59). During prosecution, the applicant referred to a "waterproof enclosure, housing the electronic device within" so that the device could be "used in a vehicle such as a car, a camper, a boat, or in other common consumer products" (Bohrer Exh. D at 6). Accordingly, if "hermetically seals" doesn't mean airtight, then this intrinsic evidence would lead a person of ordinary skill in the art in 2007, to believe that the phrase at least meant "the electronic device is sealed within a *waterproof* enclosure."

Substituting the word "waterproof" for the phrase "hermetically seals" turns out to be only a way station for our patentee, who insists that we go further and dilute "waterproof" to mean "water resistant," a term never used in the specification. Our patentee's expert, for example, states that the "specific meaning of 'waterproof' must be determined in view of the specific application and the conditions that application will be exposed to." The term would have "different meanings depending upon the application" (Ganaja Decl. ¶¶ 43, 58, 62).

Next, our patentee points to the "IP Codes," which define nine degrees of sealing protection provided by enclosures of electrical equipment against water intrusion — IPX0 for "not protected" all the way to IPX8 for "protected against the effects of continuous immersion in water" (Ganaja Exh. C). Although these codes existed at the time of the application, they went unmentioned in the specification (or prosecution history). We learn about them now for the first time.

On summary judgment, our patentee submitted lab results showing that an accused docking station passed the IPX4 standard (Ganaja Decl. ¶ 89, Exh. D). Some of the accused's marketing materials even represented that the products passed "IPX5 waterproofing" (Bohrer Exhs. E, F).

4

Following oral argument and in response to an attack based on indefiniteness, our patentee shifted (in a supplement) to argue that "waterproof" meant "marine grade watertight" under the Coast Guard regulations. Section 110.15-1 of Title 46 of the Code of Federal Regulations states (emphasis added):

> ***Waterproof means watertight***; except that, moisture within or leakage into the enclosure is allowed if it does not interfere with the operation of the equipment enclosed. In the case of a generator or motor enclosure, waterproof means watertight; except that, leakage around the shaft may occur if the leakage is prevented from entering the oil reservoir and the enclosure provides for automatic drainage.
>
> ***Watertight means enclosed so that equipment meets at least*** a NEMA 250 Type 4 or 4X or ***an IEC 60529 IP 56 rating***.

"IEC 60529 IP 56" means "IPX6," our patentee stated (Supp. Br. 4). IPX6 means "protected against powerful water jets" (Lorelli Exh. 16). Now, our patentee seeks leave to submit "supplemental evidence" showing that the accused products satisfy IPX6.

Taking our patentee at its word that "hermetically seals" has no fixed meaning, this order holds that independent Claim 16 is invalid as indefinite under Section 112, ¶ 2. The Patent Act, 35 U.S.C. 112, states that the specification must conclude with one or more claims "particularly pointing out and distinctly claiming the subject matter" which the inventor regards as the invention. Recently, the Supreme Court has held that "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. —, 134 S. Ct. 2120, 2124, 2129 (2014). Absent a meaningful "definiteness" check, applicants face powerful incentives to inject ambiguity into their claims. In fact, practitioners before the PTO sometimes intentionally select elastic language that can be expanded to cover accused products (for infringement) and/or contracted to evade prior art (for invalidity).

"The claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014). It would be bad policy to "tolerate imprecision,"

5

*Nautilus*, 134 S. Ct. at 2130, or to encourage a "zone of uncertainty," *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942).

Claim 16 fails to inform, with "reasonable certainty," those skilled in the art about the scope of the invention. Nowhere in the specification or the prosecution history did the phrases "water resistant," "watertight," "IPX," "IP Code," "110.15-1," or "Coast Guard" appear. If the applicant intended to refer to the IP Codes, he should have stated it. It is now too late to try to fix it up during litigation, years later.

Not that the belated fix works. Our patentee now points to one page of a prior art reference (Lorelli Exh. 21) submitted to the Patent Office for consideration in the continuation-in-part patent (the '081 patent). There is no evidence in our record (nor could the Court find such evidence) that our patentee submitted this one-page reference in connection with the '756 patent. Nor does this one-page reference make clear that "hermetically seals" means or meant "waterproof," which means or meant "watertight," which means or meant "IPX6." The one-page prior art reference, dated February 2005, is a specification for the patentee's "CD Media Control Center" product. The reference stated in relevant part (Lorelli Exh. 21) (emphasis added):

> = ***Marine Grade Watertight*** AM/FM/CD/MP3
> = 7 Channel Weather Band Tuner
> = Stainless Steel Sealed Chassis and Mounting Hardware
> = ***IPX5 Water Intrusion & CFR-46 Rated***

(Note: The reference used equal signs ("=") in the same way most people would use bullet points to identify features of the patentee's "AQ-CD-1" product. CFR-46 means "Section 110.15-1" (quote above), according to our patentee (Supp. Br. 3).)

From this, our patentee leaps to the conclusion that persons of ordinary skill in the art in 2007, having read the claim in light of the specification and prosecution history (remember, the one-page prior art reference did not appear in the record until prosecution of the '081 patent), *Nautilus*, 134 S. Ct. at 2124, would have known with "reasonable certainty" that "hermetically seals" meant "IPX6" (or better). This order disagrees. This travel from the continuation-in-part backwards in time to the prosecution history in question is irrelevant.

6

*DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1248, 1260–61 (Fed. Cir. 2014), does not dictate a contrary outcome. There, the Federal Circuit affirmed the district court's denial of a motion for judgment as a matter of law, after the jury had found that the asserted claims were infringed and not invalid. The evidence in the *DDR Holdings* record had established that the phrase "look and feel" had a sufficiently objective meaning in the art. Here, by contrast, our patentee's own expert stated that the phrase "hermetically seals" did not have an accepted meaning within the field and that "waterproof" had "different meanings depending upon the application" (Ganaja Decl. ¶¶ 43, 62).

Accordingly, Claim 16 is invalid as indefinite.

**B.    "the user interface detachably couples from the housing unit."**

Partial summary judgment for the accused rests as well on a second, independent ground. The heart of the parties' other claim construction dispute is whether "detachably couples" in Claim 16 extends to a wireless connection. The answer is no. Accordingly, the accused products with wireless remote controls do not infringe Claim 16.

Contrary to the patentee, it would be wrong to construe the aforementioned phrase to mean "the user interface connects to or links to the housing unit in a physical, electrical or wireless manner, wherein the user interface can disconnect from or disengage from the housing unit." This is because all of the relevant references in the specification to "detachably coupl[ing]" the control interface from the housing unit were physical, not wireless. (The phrase "user interface" did not appear in the specification. The specification instead referred to a "control interface" and a "controller interface.")

The specification stated, for example, that "the control interface 105 is attached to the bottom edge of the housing unit 100 and the control interface 105 *swings upward* to couple with the top edge of the housing unit 100," "the control interface 105 is able to couple to the housing unit in a wide variety of ways, including, but not limited to, *flip down designs and detachable designs*," "the control interface 105 is both *completely attachable and detachable* from the housing unit 100," and "[in Figure 1,] the control interface 105 is *electronically coupled* to the housing unit 100 through the *interface connector* 104 and the *controller connector* 106." "In

7

1  alternative embodiments, the control interface 105 is coupled to the housing unit 100 via *a snap*
2  *connector, a hinge mount, or a tongue and groove mechanism, among other means*"
3  (cols. 4:11–24; 5:61–67; 6:4–8, 19–29) (emphasis added).  These are all physical coupling
4  mechanisms.

5   Shown now is Figure 4B from the patent:



**Figure 4B From the Specification**

"[T]he control interface 105 is detachably coupled with the housing unit 100" in this embodiment.  A user can detach the control interface from the housing unit to insert the electronic device and then re-attach the control interface to control the electronic device therein. "Preferably, the control interface 105 seals the housing unit 100 and defines a waterproof enclosure" (col. 6:4–14, 17–18).  The invention the applicant disclosed to the public described a control interface that could be "completely attachable and detachable" from the housing unit.

 This order rejects the patentee's reliance on the following passage.  The specification stated (col. 5:21–32) (emphasis added):

> In some embodiments of the present invention, a remote
> control 160 is used to control the electronic device 150 when it
> is housed within the housing unit 100.  In some embodiments,
> an infra red signal is used to transmit and receive information
> between the remote control 160 and the control interface 105
> and the housing unit 100.  In an alternative embodiment, the
> electronic device 150 is controlled by controls on the steering

United States District Court
For the Northern District of California

8

> wheel.  In alternative embodiments, *the electronic device 150 is controlled wirelessly by implementing technologies such as IEEE 802.11, Bluetooth®, Radio Frequency (RF) or any other appropriate wireless methodology*.

The wireless features of the disclosure are covered in other claims in the patent, specifically, non-asserted Claims 5, 13, 20, and so forth, which call out a "wireless remote" and "wireless transmission technologies" (cols. 9:49; 10:10, 49).  None of the *asserted* claims (*i.e.*, Claims 16, 18, 19, and 22), however, refer to a wireless remote control.  It would be wrong to read asserted Claim 16 onto the accused's wireless remote controls when the limitation in Claim 16 only states "the user interface detachably couples from the housing unit."

Accordingly, aside from the indefiniteness of Claim 16 (regarding "hermetically seals"), the phrase "the user interface detachably couples from the housing unit" should be construed as "the user interface can attach and detach or flip upward or flip downward from the housing unit." Since the accused wireless remote controls do not satisfy this physical limitation, summary judgment of non-infringement of the '756 patent is hereby **GRANTED**.

### 3. EVIDENTIARY OBJECTIONS.

The patentee objects to Exhibits 12 through 14 appended to the accused's motion because they did not show up on the accused's Patent Local Rule 4-2 disclosures and were not "properly authenticated."  This objection is **SUSTAINED**.

The patentee also objects to two video clips of an unidentified individual placing what defense counsel represented were a "MD accused product" and a "WP accused product" in a bucket of water, holding those products underwater for more than one minute, lifting the products out, and then opening up the products to show that water flows out of the enclosure (Lorelli Exhs. 7, 8).  Magnadyne's Rule 30(b)(6) witness denied having seen the video and claimed no awareness of any expected use of the accused docking station in the spa industry that involves immersion of a docking station under water (Bohrer Exh. N, Hockett Dep. 58).  The patentee objects for lack of foundation and authentication.  This objection is **SUSTAINED**.

**4.     PAGE LIMITS.**

Our local rules limit motion and opposition briefs to 25 pages of text. *See* Civil Local Rule 7-2, 7-3. A prior order reminded the parties of these limits (Dkt. No. 56).

The patentee's opposition spanned forty pages and its declarations and exhibits well exceeded the 140-page limit. The patentee failed to seek leave to file the excess pages.

The accused, however, asked for eight additional pages for its reply declaration. Two of the reply exhibits contained excerpts from recent deposition transcripts. Accordingly, the accused's motion for leave to file eight pages of exhibits in support of its reply brief is **GRANTED**.

## CONCLUSION

Accordingly, Claim 16 is **INVALID**. Alternatively, defendants' motion for summary judgment of non-infringement of the '756 patent is **GRANTED**. Judgment will not be entered until resolution of infringement and/or invalidity of the asserted claims in the other asserted patent (the '081 patent). In light of the rulings herein, the parties have until **MARCH 2 AT NOON**, to file a supplemental brief (each not to exceed three pages) explaining what effect, if any, this ruling has on the pending motion to amend the infringement contentions.

**IT IS SO ORDERED.**

Dated: February 25, 2015.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE